**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amanda G. Athanas, | No. CV-20-02292-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Amanda G. Athanas challenges the Social Security Administration's ("SSA") determination that she did not qualify for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") because she is not disabled. (Doc. 13 at 12–31, 42–68.) Athanas filed a Complaint with this Court seeking judicial review of that determination. (Doc. 1.) The Court has reviewed the briefs and the Administrative Record (Doc. 13, "AR") and now affirms the administrative law judge's ("ALJ") decision (AR at 12–31).

## I.    BACKGROUND

On October 29, 2014, Athanas filed her application for DIB, alleging that she had been disabled since February 17, 2010. (AR at 139, 303.) The Commissioner denied Athanas' application initially and on reconsideration. (AR at 171–74, 178–81.) Athanas appeared at a hearing on September 15, 2017, before an ALJ, Carla Waters, who considered whether Athanas has been disabled since February 17, 2010. (AR at 69–98.) On March 5, 2018, Waters issued a written decision finding Athanas not disabled. (AR at 136–63.)

Athanas requested review of her claim and on December 10, 2019, the Appeals Council remanded the claim. (AR at 164–68.) A second hearing was held before a different ALJ, Guy Fletcher, on March 24, 2020. (AR at 42–68.) In a decision dated May 28, 2020, Fletcher found Athanas not disabled. (AR at 12–31.) Athanas again requested review of her claim, but this time the Appeals Council denied review, making the ALJ's decision final and ripe for this Court's review. (AR at 1–6, 294–302.) Athanas now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

After reviewing and considering the medical opinions and records, the ALJ evaluated Athanas' disability based on the following severe impairments: morbid obesity, hypothyroidism, fibromyalgia, degenerative disc disease, aneurysm, status post right hemicolectomy, right foot osteoarthritis, obstructive sleep apnea, and polycystic ovary syndrome. (AR at 19–22.) In making this determination, the ALJ reviewed the entire record, including medical records and opinions and statements from Athanas. (AR at 18–25.) The ALJ also evaluated Athanas' "medically determinable mental impairments of depression and attention deficit disorder, considered singly and in combination" and determined that they "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were, therefore, non-severe." (AR at 22; *see* AR at 22–25.) When making the mental health determination, the ALJ reviewed the entire record, including medical records and statements from Athanas, opinion evidence, and "the four functional areas defined within disability regulations for evaluating mental disorders." (*Id.*) The ALJ found that "[t]he severity of the [Athanas'] physical impairments, considered singly and in combination, did not meet or medically equal the criteria of any impairment listed in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1)." (AR at 25.)

Next, the ALJ calculated Athanas' residual functional capacity ("RFC"). The ALJ determined that Athanas had the RFC to perform light work with the additional accommodation that she be provided access to a restroom that is at most a 10-min walk from her workstation given her colorectal surgeries and irritable bowel syndrome.

(AR at 26.) When determining Athanas' RFC, the ALJ analyzed conflicting medical and opinion evidence. (AR at 25–30.) Nevertheless, the ALJ found that the medical record demonstrates functional abilities and behaviors inconsistent with the duration, frequency, and severity of Athanas' alleged limitations. (*Id.*) Based on Athanas' RFC, the ALJ determined that she could perform past relevant work as a legal secretary. (AR at 30–31.) Accordingly, the ALJ found that Athanas was not disabled during the relevant period. (AR at 31.)

## II.    STANDARD OF REVIEW

In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a preponderance; it is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* To determine whether substantial evidence supports a decision, the Court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citation omitted). Finally, the Court may not reverse an ALJ's decision on account of an error that is harmless. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006). "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d 1104, 1119 n.11 (9th Cir. 2012) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). "An error is harmless if it is inconsequential to the ultimate nondisability determination, or if the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citations

and internal quotation marks omitted).

To determine whether a claimant is disabled, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled, and the inquiry ends. *Id*. At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled, and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. *Id*. At step four, the ALJ assesses the claimant's RFC and determines whether the claimant is still capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled, and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where the ALJ determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

## III.   DISCUSSION

Athanas raises three arguments. First, she argues that the ALJ failed to properly weigh the medical opinion evidence and failed to properly determine her RFC. (Doc. 18 at 24–32.) Second, the ALJ erred by finding her mental impairments non-severe. (*Id.* at 33–39.) Third, she argues the ALJ failed to properly evaluate her subjective statements. (*Id.* at 39–42.) As addressed below, the Court disagrees with Athanas on all three challenges and affirms the ALJ's decision.

### A.   Medical Opinion Evidence and RFC

Although an ALJ must consider all the medical evidence in the record, medical

opinion sources are separated into three types: (1) treating physicians (who treat a claimant), (2) examining physicians (who examine but do not treat a claimant), and (3) non-examining physicians (who do not examine or treat a claimant). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (superseded by statute on other grounds). For disability benefit applications filed prior to March 27, 2017, treating medical sources are generally given more weight than non-examining sources due to a treating physician's heightened familiarity with a claimant's condition. 20 C.F.R. § 404.1527(a)(2). If the ALJ declines to give controlling weight to a treating source's opinion, the ALJ must consider several factors—including the examining relationship, treatment relationship, the length and nature of treatment, supportability, consistency, and specialization, among other factors—in deciding how to weigh the source's opinion. 20 C.F.R. § 404.1527(c). The ALJ must thereafter provide an explanation for the weight given to each medical source. 20 C.F.R. § 404.1527(f)(2). If certain evidence contradicts a treating physician's opinion, the ALJ must provide "specific and legitimate reasons supported by substantial evidence" for rejecting that physician's opinion. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Lester*, 81 F.3d at 830) (internal citation marks omitted).

Despite the deference generally afforded to treating physicians, the ALJ is not required to rely on them. If a treating physician's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record," the ALJ need not give it controlling weight. *Id.* § 404.1527(c)(2); s*ee also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings). If a treating physician's opinion is not given controlling weight, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c) in assigning its relative weight. When rejecting a treating physician's testimony, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Orn*, 495 F.3d at 631 (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988)).

In laymen's terms, RFC is what the claimant can do in a work environment in spite of their disabilities or limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations define RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c). "The ALJ assesses a claimant's RFC based on all the relevant evidence in [the] case record," to determine the claimant's capacity for work. *Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017) (quotation marks and citation omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ should consider a claimant's ability to meet physical and mental demands, sensory requirements, and other functions. *See* 20 C.F.R. §§ 404.1545(b)–(d), 416.945(b)–(d). "[I]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' The RFC therefore should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (cleaned up). Additionally,

> The RFC assessment must contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate. In other words, the ALJ must take the claimant's subjective experiences of pain into account when determining the RFC.

*Laborin*, 867 F.3d at 1153 (cleaned up).

"At step four, a claimant has the burden to prove that he cannot perform his past relevant work 'either as actually performed or as generally performed in the national economy.'" *Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (quoting *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002)). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). An ALJ is free to consider any activities that "may be seen as inconsistent with the presence of a condition which would preclude all work activity." *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990). It is well established that an ALJ is also empowered to note a claimant's daily activities that "'involv[e] the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

Athanas argues the ALJ erred by giving minimal weight to the opinions of Dr. Nolan, Dr. Crincoli, and Dr. Ramsey. (Doc. 18 at 25.) Athanas asserts the ALJ's label was "erroneous" because "[h]e grossly mischaracterized the record by concluding that their opinions are unexplained and unsupported." (*Id.* at 25–26.) She supports this assertion by highlighting the evidence on which each doctor relied when making their findings. (*Id.* at 26.) Athanas then explains the unique nature of fibromyalgia and how diagnosing it is unlike other diseases. (*See id.* at 26–27.)

After that, Athanas argues that the ALJ focused on the wrong evidence. (*Id.* at 28.) Rather than focusing on "the evidence relevant to Ms. Athanas' fibromyalgia," she argues, the ALJ "focused on [her] 'conservative' treatment that provided some modest improvement of [her] symptoms." (*Id.*) In particular, Athanas argues that whether a claimant has improved "must be viewed in light of the overall diagnostic record" because "there can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." (*Id.*) Athanas asserts that the ALJ failed to rely on evidence that her treatment "resulted in significant improvement to a degree that conflicts with the opinions form the treating medical sources." (*Id.*) Athanas also argues that this failure is particularly significant in cases involving fibromyalgia because "an individual's statements 'cannot be discredited for failing to pursue non-conservative treatment options' when 'none exist' for the condition, such as for fibromyalgia." (*Id.*)

Athanas argues that the ALJ did not properly weigh the evidence regarding her daily activities. (*Id.* at 29.) Athanas asserts that there was insufficient evidence for the ALJ to determine that she regularly engages in activities that contradict the opinions of her doctors.

(*Id.*) She also argues that the ALJ failed to identify substantial evidence contradicting Dr. Nolan, Dr. Crincoli, and Dr. Ramsey's opinions. (*Id.* at 30.) Thus, she argues, the doctors' assessments of Athanas' should be controlling. (*Id.*)

Finally, Athanas argues that, even if the doctor's opinions should not be controlling, they should be entitled to deference and "weighed using all of the factors provided in 20 C.F.R. § 404.1527." (*Id.* at 31.) Athanas notes that, sometimes, "a treating source's medical opinion will be entitled to the greatest weight and adopted, even if it does not meet the test for controlling weight." (*Id.*) Athanas asserts that the ALJ's analysis of Dr. Crincoli, Dr. Nolan, and Dr. Ramsey's opinions was not in-depth enough and ignored many of the factors it should have considered. (*Id.*) Failure to recognize these factors, Athanas argues, requires a remand. (*Id.*)

Regarding Athanas' RFC, she also argues that the ALJ incorrectly concluded she could perform light work because the ALJ did not properly weight the opinions of her doctors. (*Id.* at 32.) Additionally, Athanas argues that the ALJ "failed to explain what evidence" supported his conclusion that she could perform light work. (*Id.*) Specifically, Athanas highlights that RFC assessments must "include a narrative discussion describing how the evidence supports each conclusion, citing" specific medical facts and nonmedical evidence. (*Id.*) She asserts that the ALJ failed to identify medical facts or persuasive nonmedical facts that support his conclusion. (*Id.*) Thus, for this independent reason, Athanas argues this case should be remanded. (*Id.*)

The Commissioner argues that the ALJ "properly discounted Dr. Nolan's, Dr. Crincoli's, and Dr. Ramsey's" medical opinions by finding "that their conclusions merited no significant weight" because they "simply set forth their conclusions in a form with practically no explanation." (Doc. 21 at 5, 8.) The Commissioner asserts that all three doctors "completed questionnaires that largely limited [Athanas] to the same functional limitations," but the ALJ was correct to conclude that "the objective medical evidence did not corroborate their conclusions regarding the extent of [Athanas'] physical limitations." (*Id.* at 7.) The Commissioner argues that the ALJ correctly noted that Athanas presented a

normal range of motion, strength, and stability in her extremities during examinations and that there "was no objective medical evidence supporting limitations related to [her] hands." (*Id.*)

Next, the Commissioner argues that the ALJ was correct to discount these three doctor's opinions because the opinions did not provide explanations for the "extreme limitations" they proposed. (*Id.*) The ALJ was entitled to do this, the Commissioner argues, because ALJs are empowered "to reject an opinion that [does] not explain the basis for the opinion." (*Id.*) The Commissioner also argues that the questionnaires did not support clinical findings or provide objective proof of the limitations the doctors proposed. (*Id.*) Instead, the Commissioner asserts that the questionnaires merely generically referenced fibromyalgia and pain. (*Id.*) The Commissioner then highlights contradictory results that the questionnaires yielded in support of this argument. (*Id.* at 8.) For example, all three doctors noted that Athanas could never, rarely, or only occasionally grasp or finger, yet none of them reported that Athanas felt pain in her hands or lower arm. (*Id.*) What is more, the Commissioner notes that the doctors failed to discuss "how the severity, frequency, or duration of Plaintiff's symptoms might cause the disabling functional limitations they proposed." (*Id.*) The Commissioner asserts that none of the doctors reconcile this apparent discrepancy. (*Id.*) The Commissioner also notes that Dr. Ramsey "failed to explain why he initially opined that he had 'no idea not my specialty' in response to Plaintiff's functional limitations, but then changed his opinion to the disabling limitations" in his report. (*Id.*)

The Commissioner further argues that it was reasonable for the ALJ to conclude that the medical opinions "were heavily influenced by [Athanas'] subjective allegations." (*Id.*) The Commissioner notes that Dr. Nolan spent the entirety of the fifteen-minute visit in December 2014 filling out the questionnaire, Dr. Crincoli has only seen Athanas twice with a large part of those visits spent filling out disability paperwork, and Dr. Ramsey had not seen Athanas in about a year and a half when completing the January 2015 questionnaire. (*Id.*) The Commissioner also highlights that the visits on the dates when the questionnaires were filled out "completely lacked significant physical findings that

1    supported the extreme limitations they proposed." (*Id.*)

2         The Commissioner maintains that the ALJ correctly discounted the medical

3    opinions because, in stark contrast to the severe limitations the doctors diagnosed, the

4    prescribed treatments were conservative. (*Id.* at 9.) This evidence, Commissioner argues,

5    could allow the ALJ to reasonably find that Athanas required more aggressive treatment

6    than that which she was prescribed. (*Id.*)

7         Finally, the Commissioner argues that the ALJ reasonably found that the medical

8    opinions were "at odds with [Athanas'] own admission about her level of activity." (*Id.*)

9    For example, although all three doctors opined that Athanas "had extreme limitations in

10   sitting, standing, grasping, fingering, reaching, and maintaining attention and

11   concentration," she "used an elliptical, walked up to six miles per week, went to the gym,

12   swam, lifted weights, traveled extensively, drove, shopped in stores, prepared simple

13   meals, mopped, and performed other household chores." (*Id.* (citing (AR at 27, 59, 367–

14   70, 1333, 1345, 1395, 1469, and 2250))) Because "this Court is precluded from reweighing

15   the evidence and is obliged to uphold the ALJ's own reasonable interpretation of the

16   evidence," the Commissioner argues, "this Court should affirm." (*Id.* at 10.)

17        It was reasonable for the ALJ to find that Dr. Nolan, Dr. Crincoli, and Dr. Ramsey's

18   medical opinions were not well supported, to not give them controlling weight, and to

19   assign them minimal weight. Given the limited persuasive value of these medical opinions,

20   the ALJ's RFC determination was reasonable and the ALJ's decision should be affirmed.

21                    1.    Dr. Ramsey's Medical Opinion

22        The ALJ gave one of Dr. Ramsey's opinions, a summary of her care for Athanas,

23   "partial weight" where Dr. Ramsey "noted that pain, weight, and fatigue limited her

24   activities." (AR at 28, 2050.) The ALJ could not give that opinion more weight because

25   Dr. Ramsey had a lengthy gap in treatment, about a year and a half, during the relevant

26   time period of Athanas' disability claim. (AR at 28, 2223–37.) Dr. Ramsey also noted on

27   this form that she was not currently treating Athanas. (*Id.*) This reduced the weight assigned

28   by the ALJ. (*Id.*) What is more, the treatment notes that were taken lacked objective

1    medical information that could support Dr. Ramsey's medical opinion regarding the
2    severity of Athanas' disability. (*See id.*)

3         It was also reasonable for the ALJ to assign minimal weight to Dr. Ramsey's other
4    opinions. First, the ALJ's conclusion that the September 2006 letter Dr. Ramsey wrote is
5    not relevant was reasonable because, as the ALJ notes, it "was provided prior to the period
6    at issue and provides no insight to the claimant's conditions during the period of review."
7    (AR. at 28, 2271.) Second, the ALJ's decision to assign minimal weight to Dr. Ramsey's
8    January 2015 Disability Impairment Questionnaire was reasonable. (AR. at 28, 2223–29.)
9    As the ALJ explained, "[Ramsey] advised that [Athanas'] primary symptom was the
10   inability to lose weight," but Dr. Ramsey "declined to answer questions regarding
11   functional capacity, likelihood of absences, or contributing factors to symptoms and
12   limitations, writing that she had 'no idea' as they were not her specialty." (AR at 28.) The
13   ALJ also correctly noted that Dr. Ramsey "did indicate [Athanas] had no significant
14   limitations in reaching, handling, or fingering," but "the opinion [was] generally
15   incomplete, nonspecific, and insufficient to assess further functional limitations."
16   (AR at 28.)

17        Finally, Dr. Ramsey completed two Multiple Impairment Questionnaires in January
18   2019 and April 2020. (AR at 28, 2324–29, 2535–40.) Based on these questionnaires, Dr.
19   Ramsey determined that Athanas could sit for one hour and stand or walk less than one
20   hour in an 8-hour work day; would need to get up from a seated position every 45 minutes
21   and not return to a seated position for at least 20 minutes; could occasionally lift and carry
22   up to 20 pounds; would miss work at least three times a month; could never use her right
23   extremity for reaching, handling, or fingering; and could occasionally use her right
24   extremity for reaching, handling, or fingering. (AR at 28, 2324–29, 2535–40.) But, as the
25   ALJ rightly noted, Dr. Ramsey provided no explanation on the form to support these
26   conclusions. (AR at 28.) The ALJ also correctly noted that Athanas' medical record does
27   not support the reaching, handling, or finger limitations. (AR at 28–29.) Finally, the ALJ
28   correctly noted that these restrictions are not consistent with Athanas' activities or her

1   treatment regimen. (AR at 29.) The ALJ properly noted that, during this period, Athanas

2   used an elliptical, walked up to six miles per week, went to the gym, swam, lifted weights,

3   traveled extensively, drove, shopped in stores, prepared simple meals, mopped, and

4   performed household chores. (AR at 27, 59, 367–70, 691, 1333, 1345, 1395, 1469, 2250.)

5   She also applied to at least 100 jobs and had 20 interviews. (AR at 50.) Even when

6   considering a rare and relatively unknown disease like fibromyalgia, ALJs need not accept

7   medical conclusions without an explanation beyond, "because I said so." Thus, the ALJ's

8   analysis of Dr. Ramsey's medical opinions was reasonable and will be affirmed.

9                           2.       Dr. Nolan's Medical Opinion

10      In December 2014, August 2017, and August 2018, Dr. Nolan completed three

11  Fibromyalgia Questionnaire forms for Athanas. (AR at 29, 1322–27, 2233–37, 2319–23.)

12  Dr. Nolan noted on the 2014 form that Athanas met the American College of

13  Rheumatology's criteria for fibromyalgia and confirmed with Robaxin treatment.

14  (AR at 29.) All three questionnaires had a nearly identical set of restrictions listed as Dr.

15  Ramsey's questionnaire. Dr. Nolan also wrote an open letter in December 2015 explaining

16  Athanas' treatment history with him since April 2014. (AR at 29, 1973–74.) In contrast to

17  Athanas' own personal statements, Dr. Nolan stated in that letter that Athanas quit working

18  because of her fibromyalgia. (AR at 29, 1297, 1973–74.) Dr. Nolan also wrote a letter

19  excusing Athanas from jury duty due to her medical conditions. (AR at 29, 2027–30.)

20      The ALJ reasonably gave Dr. Nolan's medical opinion minimal weight. At the

21  December 2014 visit, Dr. Nolan spent the entire time with Athanas filling out the form.

22  (AR at 29, 1641–48.) The December form also contained no explanation for Dr. Nolan's

23  conclusions. (*Id.*) As with Dr. Ramsey's medical opinions, the sitting and standing

24  restrictions appear plausible but have no accompanying explanation, and the reaching,

25  handling, and fingering restrictions are not supported in the medical record. (AR at 29.)

26  The ALJ also reasonably identified that Dr. Nolan's prescribed limitations for Athanas'

27  work environment are not consistent with her reported activities or her course of treatment.

28  (*Id.*) Specifically, Dr. Nolan's reports do not explain why he did not adjust Athanas'

- 12 -

prescription when she responded positively to medication despite her—apparently debilitating—symptoms persisting. Thus, the ALJ's analysis of Dr. Nolan's medical opinions was reasonable and will be affirmed.

### 3.  Dr. Crincoli's Medical Opinion

In February 2015, Dr. Crincoli completed a Disability Impairment Questionnaire form. (AR at 29, 1659–63.) This form had a nearly identical medical recommendation as those completed by Dr. Ramsey and Dr. Nolan. (*See id.*) For the same reasons that the ALJ was right to give Dr. Nolan and Dr. Ramsey's opinions minimal weight, it was reasonable for the ALJ to give Dr. Crincoli's February 2015 medical opinion minimal weight. (*Id.*) Dr. Crincoli only saw Athanas twice and the bulk of their time together was spent filling out disability paperwork. (AR at 1667–1700.) As with Dr. Nolan and Dr. Ramsey's opinions, Dr. Crincoli did not explain why Athanas was unable to sit longer than an hour and use her arms, hands, or fingers at work. (AR at 29, 1659–63.) Specifically, as noted above, there is no pathology, consistent complaint, or any medical evidence in the record to support his conclusion that Athanas' could not use her arms, hands, and fingers. (AR at 29.) Thus, the ALJ's analysis of Dr. Crincoli's medical opinions was reasonable and will be affirmed.

### 4.  The ALJ's RFC Determination

Given the medical evidence, the ALJ reasonably determined that Athanas' disability limited her to light work with the additional restriction that she requires restroom access within a 10-minute walk of her workstation.[1] (AR at 25.) As the ALJ's opinion demonstrates, he properly considered the medical evidence presented after appropriately weighing the evidence before determining Athanas' RFC. (*See* AR at 25–30.) The ALJ

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

1    accomplished this through not only an extensive discussion of the medical evidence, but

2    also the personalized RFC restroom parameter that he incorporated into Athanas' RFC.

3    (*Id.*) For example, the ALJ reasonably determined to weigh some medical opinions less

4    than others given Athanas' lifestyle choices and activities, and Athanas' lifestyle was

5    considered during the RFC analysis. (*Id.*) The ALJ also considered the medication Athanas

6    has taken to alleviate her symptoms; her refusal to take medication and her unwillingness

7    to stick to a prescribed medication regimen; her two colorectal surgeries; her subjective

8    statements; her history of chiropractic care and back pain; her physical therapy history,

9    including the fact that her physical therapist determined "that she was fully functional and

10   able to demonstrate tasks such as squatting, climbing stairs, and ambulating on a level

11   surface;" and the medical opinions of Dr. Brown, Dr. Nolan, Dr. Ramsey, Dr. Crincoli, and

12   Dr. Goldberg. (*See id.*) Thus, the ALJ's RFC determination was reasonable and will be

13   affirmed.

14       **B.    Mental Impairment Severity**

15       When evaluating mental impairment severity, ALJs must follow a two-step

16   procedure. *See* 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The first step requires evaluating

17   a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether

18   [claimant has] a medically determinable mental impairment[]." 20 C.F.R.

19   §§ 404.1520a(b)(1), 416.920a(b)(1). In doing so, the ALJ must also "specify the

20   symptoms, signs, and laboratory findings that substantiate the presence of [each

21   determined] impairment and document [the] findings . . . ." 20 C.F.R. §§ 404.1520a(b)(1),

22   416.920a(b)(1).

23       The second step involves the ALJ rating "the degree of functional limitation

24   resulting from [claimant's] impairment." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).

25   This process varies case-by-case. For every claimant, the ALJ must consider every piece

26   of relevant evidence and determine the degree to which the claimant's "ability to function

27   independently, appropriately, effectively, and on a sustained basis" is hindered by his or

28   her mental impairment. 20 C.F.R. §§ 404.1520a(c), 416.920a(c). The ALJ does this by

rating the claimant's degree of functional limitation in four areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* The rating system is based on a five-point scale: "None, mild, moderate, marked, and extreme." *Id.* Beyond this determination, an "ALJ [is] not required to make any more specific findings of the claimant's functional limitations." *Hoopai v. Astrue*, 499 F.3d 1071, 1077–78 (9th Cir. 2007). Next, the ALJ determines the severity of the mental impairment. *See* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). During this process, to explain and record his or her administrative review, an ALJ must provide the proper documentation including a standard document accounting how the technique was applied. *See* 20 C.F.R. §§ 404.1520a(e), 416.920a(e). Later reviews by written decision must also "document application of the technique." *See id.*

Athanas argues that the ALJ erred when determining that her depression and attention deficit disorder (ADD) were non-severe. (Doc. 18 at 33.) She takes issue with the ALJ's decision to give little weight to Dr. Steingard's medical opinion because it was "vague and unsupported by the examination and Ms Athanas' 'conservative' course of mental health." (*Id.* at 33–34.) Additionally, Athanas argues that the ALJ's decision to give greater weight to the "non-examining state agency medical consultant who found [Athanas'] mental impairments non-severe" was a mistake. (*Id.* at 34.) Specifically, Athanas argues that Steingard's opinions, which list a number of mental limitations, do not support the ALJ's conclusion that Athanas has no mental limitations that affect her work. (*See id.*) Athanas' also highlights that these conclusions lead "the government's vocational expert to testify that similar restrictions would preclude Ms. Athanas from working." (*Id.*) Alternatively, Athanas argues that the ALJ should have requested clarification regarding the extent of her impairments rather than ignoring the vocational expert's analysis. (*Id.* at 34–35.)

Athanas also argues that the ALJ erred when she concluded that Steingard's opinions were not supported by her own findings. (*Id.* at 35.) The ALJ's evaluation found that Athanas presented "significant abnormalities, including variable facial expression,

limited attention span with problems focusing, a dramatic style, she was verbose, overinclusive, tangential, and exhibited circumstantial thinking, limited insight," and "she lost focus when given directions for two tasks at the same time." (*Id.*) Athanas claims "[s]uch findings are the gold standard" when an ALJ evaluates "the severity of a patient's mental impairments." (*Id.*) Athanas also highlights that these findings were confirmed by Athanas' treatment records that confirmed depression and ADD. (*Id.*) Athanas also asserts that the ALJ's emphasis on Athanas' "conservative" treatment for her mental health was misguided. (*Id.* at 37.) Athanas argues that individuals do not require hospitalization to be disabled and that her treatment regimen of psychotropic medications was not conservative. (*Id.* at 37–38.) Athanas also argues that the ALJ erred by relying on the opinion of a non-examining state agency psychologist because greater deference is due to the opinions of examining medical sources. (*See id.* at 38.) Athanas emphasizes that "[r]eliance on non-examining consultants is particularly inappropriate in the context of mental impairments, which are properly assessed only by personal interview of a patient." (*See id.*) This is particularly true, Athanas argues, in cases such as hers "where the examining specialist was hired by the government." (*Id.*)

The Commissioner disputes Athanas' position on severe mental impairment. (Doc. 21 at 14.) The Commissioner argues that the ALJ properly considered Dr. Steingard's opinion and properly discounted Steingard's opinion given its limitations. (*Id.*) The Commissioner also asserts that Athanas failed to meet her burden of establishing her mental impairments were severe because the record in this case contains hardly any objective findings and treatment related to her mental impairment. (*Id.* at 15.) The Commissioner then emphasizes that "[w]hether an impairment 'significantly limits the claimant's physical or mental ability to do basic work activities' is a finding that falls within the purview of the ALJ, not a physician. (*See id.*)

The Commissioner also argues that the ALJ correctly found that Athanas' mental examination findings and her conservative treatment regimen did not support functional accommodations. (*See Id.* at 16.) Additionally, the Commissioner argues that Athanas fails

- 16 -

to establish what limitation should have been included in the RFC. (*Id.*) The ALJ's findings, the Commissioner argues, were also supported by the State agency medical consultant opinions. (*Id.*) The Commissioner argues that the SSA recognizes these consultants are highly qualified at evaluating disability claims. (*Id.*) In the alternative, the Commissioner asserts that because the ALJ continued the sequential analysis and considered all of Athanas' impairments, even the non-severe ones, when evaluating her claim, any error the ALJ committed was, at best, harmless. (*Id.* at 14, 17.)

There is sufficient evidence to support the ALJ's determination regarding the severity of Athanas' mental impairments. The ALJ properly assessed and considered the medical opinions of Dr. Steingard and the state agency psychological consultant. (AR at 23.) It was reasonable for the ALJ to afford Steingard's opinion little medical weight. Steingard's conclusions that Athanas would require "some" instructions and that her mental condition presented "some limitations" are too vague. (*Id.* at 1921–28.). What is more, when considering Athanas' documented improvement on Wellbutrin, the ALJ was correct to afford Steingard's vague medical opinion about the severity of Athanas' conditions little weight. (*Id.* at 23.) Because the meaning, extent, and degree of "some" instructions and "some limitations" Athanas' ADD and depression require, the ALJ was reasonable in affording Steingard's opinion little weight.

The ALJ also properly went through the second step by rating Athanas' degree of function limitation in the four functional areas. (*Id.* at 23–24.) In understanding, remembering, or applying information; the ALJ was correct to consider Athanas' testimony where she "reported no difficulties in this area." (*Id.* at 23, 366–74.) The ALJ also properly relied on the fact that Athanas reportedly stopped working due to a layoff, not mental health problems. (*Id.* at 23, 366–74, 1297.) Finally, the ALJ properly noted that "no objective mental status examination findings indicate[d] deficits in this area." (*Id.* at 23.) In fact, Dr. Steingard noted unimpaired memory during the evaluation. (*Id.* at 23, 1921–28.) And so, it was reasonable for the ALJ to find that Athanas' limitation in this area was, at worst, mild.

In the second area, the ALJ properly found that Athanas "had no limitation in interacting with others." (*Id.* at 24.) Dr. Steingard's opinion that Athanas could have "some" degree of social interaction limitations due to her ADD and struggling to stay on topic is minimally persuasive, at best. (*Id.* at 24, 1921–28.) The ALJ was correct to consider the remaining medical record in this case, including Athanas' own report that she had little to no difficulties in this area, and determine that Athanas' limitation was no more than mild. (*Id.* at 24, 366–74.)

In the third area, the ALJ reasonably found that Athanas presented no limitation in concentrating, persisting, or maintaining pace. As the ALJ noted, the record reflects "no depression-related deficits in concentration or attention noted in the claimant's reports or according to the limited medical evidence." (*Id.* at 24, 366–74.) The ALJ was also reasonable to deduce that Athanas' problems with fatigue are more likely tied to her untreated sleep apnea and hypothyroidism. (*Id.* at 24.) Steingard's opinion was that Athanas struggled to stay on task, which the ALJ observed "might affect persistence or pace." (*Id.* at 1921–28.) But Athanas' mini mental status exam was normal and the ALJ found "no deficits in the claimant's reported functioning to support limitations in this area." (*Id.* at 24.) Thus, it was reasonable for the ALJ to find Athanas' limitation in this area was no more than mild. (*Id.*)

The ALJ also reasonably found that the fourth and final area, adapting or managing oneself, was not a limitation for Athanas. She required minor mental health treatment in the form of antidepressant pills and reported poor stress management in her function report. (*Id.* at 24, 366–74.) But she also managed to perform a plethora of daily activities limited only by her physical ailments while writing and visiting family for personal enjoyment. (*Id* at 24, 366–74, 1286–1315.) Additionally, Athanas reported that antidepressant medication was helpful. (*Id.* at 24, 1332–1462.) In sum, Athanas had never undergone serious mental health treatment like inpatient, acute, or specialized psychiatric care. (*Id.* at 24.) It was reasonable for the ALJ to find Athanas' limitation in this area was mild at worst. (*Id.*) Therefore, the ALJ did not err in its mental impairment determination.

Because the ALJ did not err, the Court refrains from engaging in a harmless error analysis.

## C.  ALJ's Evaluation of Athanas' Subjective Statements

An ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to [the Act]." *Molina*, 674 F.3d at 1112 (citing *Fair*, 885 F.2d at 603). Thus, "the ALJ 'is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Ford v. Saul*, 950 F.3d 1141, 1149 (9th Cir. 2020) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). But the ALJ's findings regarding the credibility of subjective statements must be supported by specific, cogent reasons. *See Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

To evaluate "the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (cleaned up). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (cleaned up). This is to ensure that the ALJ has not "arbitrarily discredit[ed]" the claimant's subjective testimony. *Thomas*, 278 F.3d at 957. That said, an ALJ's determination of the credibility of Plaintiff's subjective complaint is "entitled to great weight." *See Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (citation omitted).

Athanas argues that substantial evidence does not support the ALJ's evaluation of her subjective statements. (*Id.* at 40.) She asserts that, as with the ALJ's dismissal of medical opinions, the ALJ erred when he dismissed her subjective statements because they

are inconsistent with her daily activities. (*Id.* at 40–41.) Athanas also argues that the ALJ erred when he concluded that she stopped working for reasons unrelated to her disability because there is clear evidence in the record that she "was having significant struggles maintaining her job prior to" her statement that she was "laid off". (*See id.* at 41.) Athanas asserts that her disability has not improved since she was laid off, that there is no evidence that she could maintain a job, and that her inability to work does not mean she lacks a desire to work. (*Id.*) Additionally, Athanas argues that her prior work history of 27 years before her disability indicates that she does have the desire to work but simply cannot. (*Id.*) This work history, she argues, makes her claims that she is unable to work due to her disability more credible. (*Id.*)

The Commissioner argues that the ALJ correctly found that Athanas' subjective symptom testimony was not supported by the objective medical evidence, her lifestyle and day-to-day activities, and her treatment history. (Doc. 21 at 10.) The Commissioner first argues that the ALJ's finding that "the objective medical evidence did not corroborate [Athanas'] claims of disabling symptoms and functional limitations" was proper. (*Id.* at 11.) The Commissioner highlights that the ALJ properly noted that Athanas claimed her ability to stand, sit, lift, walk, concentrate, and focus was severely inhibited by the pain her disability caused. (*Id.*) But, in contrast to these claims, the ALJ also recognized that Athanas' had normal physical examinations. (*Id.*) Prior to 2014, there was little evidence of fibromyalgia and her physical examinations were normal; she "had limited mental health treatment showing positive mental status findings;" and "during a consultative examination, [her] mental status examination was unremarkable, and she scored a 29/30 on a mini mental state exam." (*Id.*)

Second, the Commissioner argues that the ALJ did not err by rejecting Athanas' disability claims given her daily activities. (*Id.* at 11–12.) Specifically, the Commissioner argues that the ALJ "reasonably determined that Plaintiff's allegations about her limitations were at odds with his admissions about her daily activities." (*Id.* at 12.) The Commissioner notes that the ALJ observed that Athanas "reported that she could sit for thirty minutes,

stand for ten minutes, occasionally lift eight to ten pounds, and had significant difficulties with fatigue." (*Id.*) Yet, as the ALJ noted, Athanas "used an elliptical, walked up to six miles per week, went to the gym, swam, lifted weights, traveled extensively, drove, shopped in stores, prepared simple meals, mopped, and performed other household chores." (*Id.*) Thus, the Commissioner argues, "[e]ven if [Athanas'] capacity to engage in the above activities were susceptible to a different interpretation, this Court must still uphold the ALJ's reasonable discounting of Plaintiff's claims of disabling symptoms and functional limitations." (*Id.*)

Third, the Commissioner argues that it was reasonable for the ALJ to discount Athanas' subjective complaints given the ALJ's review of Athanas' treatment history. (*Id* at 13.) The Commissioner asserts that the ALJ properly weighed the fact that Athanas was, at times, not compliant with her medication regimen despite it proving effective. (*Id.*) Thus, the Commissioner argues, the ALJ was right to use that fact when considering Athanas' subjective complaints. (*See id.*)

Finally, the Commissioner asserts that the ALJ correctly concluded that Athanas stopped working for reasons unrelated to her disability. (*Id.*) The ALJ was correct, the Commissioner argues, to focus on Athanas' February 2010 report to her treatment provider in which she explained that filing a complaint against her employer, not her limitations stemming from her disability, lead to her being laid off. (*Id.*) What is more, the Commissioner argues that "this contemporaneous statement contradicts her hearing testimony where she reported that she was laid off because she called in sick too many times." (*Id.*) And so, the Commissioner argues that the ALJ's decision to discount Athanas' subjective testimony was supported by substantial evidence and should be affirmed. (*Id.* at 14.)

The Court holds that the ALJ had sufficient evidence to support her rejection of Athanas' subjective statements. In the first step of the analysis, the ALJ properly determined that Athanas' "impairments could reasonably be expected to have caused the alleged" subjective symptoms. (AR at 26.) Morbid obesity, hypothyroidism, fibromyalgia,

degenerative disc disease, aneurysm, a status post right hemicolectomy, right foot osteoarthritis, obstructive sleep apnea, and polycystic ovary syndrome could cause Athanas' alleged subjective feelings of pain. And so, the Court affirms the ALJ's decision in step one.

The ALJ also did not err in the second step of the analysis because the ALJ's analysis of evidence was reasonable. First, the objective medical evidence casts doubt on Athanas' claims of pain. There was little evidence of fibromyalgia prior to 2014, her physical examinations were normal, and she showed no signs of a negative metal status. (AR at 22, 27, 1353, 1371, 1358–60, 1362–65, 1368–70, 1924.) Second, in light of Athanas' alleged levels of pain, her daily activities are inapposite. The ALJ properly noted that Athanas used an elliptical, walked up to six miles per week, went to the gym, swam, lifted weights, traveled extensively, drove, shopped in stores, prepared simple meals, mopped, and performed household chores. (AR at 27, 59, 367–70, 691, 1333, 1345, 1395, 1469, 2250.) She also applied to at least 100 jobs and had 20 interviews. (AR at 50.) Third, the ALJ properly considered Athanas' treatment history when rejecting her claims. Athanas' Robaxin prescription helped her pain, but she did not comply with her treatment plan. (AR at 27, 373, 1319, 1353, 1362–63, 1469, 1813–14, 2028, 2030, 2061–63, 2075, 2239–40.) Thus, it was reasonable for the ALJ to reject her claims of subjective pain when she actively refused to take medication that she herself reported helped with her symptoms. Finally, the ALJ correctly noted that Athanas did not stop because of her disability. Athanas herself informed her treatment provider that she was laid off because she filed a complaint against her employer, not because of her limitations stemming from her disability. (AR at 1297.) Thus, "it is unclear when or if the claimant would have stopped working due to difficulties with her conditions." (AR at 26.)  And so, the ALJ offered sufficient evidence and explanations to reject Athanas' testimony regarding the severity of her symptoms. Therefore, the Court affirms the ALJ's decision to reject Athanas' subjective testimony.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED affirming** the May 28, 2020 ALJ decision (AR at 12–31).

**IT IS FURTHER ORDERED** directing the Clerk to enter final judgment consistent with this Order and close this case.

Dated this 29th day of November, 2021.

Michael T. Liburdi
United States District Judge